# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 22, 2007        Decided April 15, 2008

No. 06-5282

JENNIFER K. HARBURY ON HER OWN BEHALF AND AS
ADMINISTRATRIX OF THE ESTATE OF EFRAIN
BAMACA-VELASQUEZ,
APPELLANT

v.

MICHAEL V. HAYDEN, DIRECTOR,
CENTRAL INTELLIGENCE AGENCY (CIA), ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 96cv00438)

*Jennifer K. Harbury*, appearing pro se, argued the cause
and filed the briefs for appellant. *Beth Stephens* and *Mara E.
Verheyden-Hilliard* entered appearances.

*Tyler Giannini* was on the brief for amicus curiae United
States Representative Barney Frank in support of appellant.

*Robert M. Loeb*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were
*Peter D. Keisler*, Assistant Attorney General, *Jeffrey A.*

*Taylor*, U.S. Attorney, *C. Frederick Beckner III*, Deputy Assistant Attorney General, and *Barbara L. Herwig*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: RANDOLPH and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* RANDOLPH joins, and with whom *Senior Circuit Judge* WILLIAMS joins except as to the second sentence of footnote five.

KAVANAUGH, *Circuit Judge*: In the early 1990s, members of the Guatemalan army killed rebel fighter Efrain Bamaca-Velasquez during Guatemala's civil war. Bamaca's widow, Jennifer Harbury, sued various U.S. Government officials, claiming they were legally responsible for the physical abuse and death of her husband. The District Court long ago dismissed most of Harbury's claims. Harbury now appeals the District Court's order dismissing her common-law tort claims. We affirm for either of two alternative jurisdictional reasons: (1) Under this Court's precedents, the case presents a nonjusticiable political question; or (2) the Federal Tort Claims Act applies to Harbury's claims, and the FTCA bars suits based on injuries that occurred in a foreign country.

I

Jennifer Harbury is a U.S. citizen and the widow of Efrain Bamaca-Velasquez, who was a citizen of Guatemala and a commander of rebel forces in that country's 35-year civil war. According to Harbury, in the 1990s the U.S. Central Intelligence Agency hired and trained Guatemalan

army officers as informants so that the CIA could gather information about the rebel forces. Harbury alleges that the CIA obtained information from the Guatemalan army officers and shared it with the White House and the State Department during the Administrations of President George H.W. Bush and President Clinton. Harbury claims, moreover, that "it was understood . . . and/or intended by the CIA that this information would be obtained through torture and similar means." Second Amended Complaint at 11, Harbury v. Hayden, 444 F. Supp. 2d 19 (D.D.C. 2006) (Civ. No. 96-438).

Harbury specifically contends that Bamaca was captured in March 1992 by Guatemalan army officers affiliated with the CIA. The CIA allegedly reported to the White House and U.S. Government agencies that its Guatemalan counterparts had captured Bamaca "and that they would probably fabricate his combat death in order to be able to maximize their ability to extract information" from him. *Id.* at 9. At the same time that the Guatemalan army publicly maintained that Bamaca had committed suicide, its officers allegedly "detained, psychologically abused and physically tortured" Bamaca in an attempt to get information from him. *Id.* According to Harbury, the Guatemalan officers then killed Bamaca.

Harbury initially sued and sought damages from many U.S. Government officials *in their personal capacities* – (i) at the CIA, Directors John M. Deutch, R. James Woolsey, and Robert M. Gates; Deputy Directors David Cohen, John J. Devine, Thomas A. Twetten, John C. Gannon, Douglas J. MacEachin, and John L. Helgerson; Latin American Division Chief Terry R. Ward; National Intelligence Officer Brian Latelle; National Intelligence Council Chiefs Richard N. Cooper, Christine N. Williams, Joseph S. Nye, and Fritz W. Esmarth; Guatemala Station Chiefs Dan Donahue and Frederick A. Brugger; and "unnamed employees" of the CIA;

(ii) at the State Department, Secretary of State Warren Christopher; U.S. Ambassador to Guatemala Marilyn MacAfee; Assistant Secretary Alexander Watson; Deputy Assistant Secretary Anne Patterson; Guatemala Desk Officer Peg Willingham; and "unnamed employees" of the State Department; and (iii) at the National Security Council, National Security Advisor Anthony Lake; NSC staff member Richard E. Feinberg; and "unnamed employees" of the National Security Council. *See id.* at 1-2, 5-8.

The District Court previously dismissed most of Harbury's claims. *See Harbury v. Hayden*, 444 F. Supp. 2d 19, 24 (D.D.C. 2006) (citing cases and orders); *see also Christopher v. Harbury*, 536 U.S. 403, 405 (2002).

Harbury's only remaining claims are common-law tort claims against the individual CIA Defendants. Harbury alleges that the individual CIA Defendants conspired to cause Bamaca's imprisonment, torture, and execution; negligently supervised their Guatemalan counterparts, resulting in Bamaca's injury and death; and caused emotional distress to Harbury as a result of Bamaca's injury and death. The District Court dismissed these claims under Federal Rule of Civil Procedure 12(b)(1). Harbury now appeals; our review is de novo.

II

To explain the District Court's decision and Harbury's appeal, we begin with a brief overview of the Federal Tort Claims Act and the Westfall Act.

The Federal Tort Claims Act is a limited waiver of the Government's sovereign immunity. Under the FTCA, plaintiffs may sue the United States in federal court for state-law torts committed by government employees within the

5

scope of their employment. 28 U.S.C. §§ 1346(b), 2671-80. But the FTCA does not create a statutory cause of action against individual government employees.

If a plaintiff files a state-law tort suit against an individual government employee, a companion statute – the Westfall Act – provides that the Attorney General may certify that the employee was acting within the scope of employment "at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Upon the Attorney General's certification, the tort suit automatically converts to an FTCA "action against the United States" in federal court; the Government becomes the sole party defendant; and the FTCA's requirements, exceptions, and defenses apply to the suit. *Id.*[1]

In many cases, the Attorney General's certification begins and ends the scope-of-employment analysis. The Government takes over as the sole party defendant, and the suit proceeds under the FTCA. From the plaintiff's perspective, this can produce a net positive: Although the plaintiff must now litigate against the Federal Government, the original defendant – a potentially judgment-proof federal employee – has been replaced by the seemingly bottomless U.S. Treasury.

---

[1] If the Attorney General does not certify that the defendant employee was acting within the scope of employment, the defendant may petition the court to make such a finding. If the court so finds, then the case becomes a federal-court FTCA case against the Government, just as if the Attorney General had filed a certification. 28 U.S.C. § 2679(d)(3)-(4). If the court finds that the government employee was not acting within the scope of employment, then the state-law tort suit may proceed against the government employee in his or her personal capacity.

Plaintiffs do not always view certification so charitably, however. As mentioned earlier, the FTCA is a *limited* waiver of sovereign immunity. The Act contains several exceptions – for example, it does not apply to claims for lost mail, suits in admirality, claims arising out of the military's combatant activities during wartime, claims based on discretionary functions, or claims that arise in foreign countries, among other exceptions. *See* 28 U.S.C. § 2680. When one of the FTCA's exceptions applies – that is, when the Government has *not* waived its sovereign immunity – the Attorney General's scope-of-employment certification has the effect of converting the state-law tort suit into an FTCA case over which the federal courts lack subject-matter jurisdiction. In other words, the combination of the scope-of-employment determination and the FTCA's exceptions may absolutely bar a plaintiff's case. *See United States v. Smith*, 499 U.S. 160, 166 (1991).

In such cases, to try to preserve their lawsuits, plaintiffs often contest the Attorney General's scope-of-employment certification. Plaintiffs typically argue that the individual government employee defendants did *not* act within the scope of their employment and that the suits should therefore continue as state-law tort suits against the government officials in their personal capacities. Once a plaintiff advances this argument, courts consider the scope-of-employment issue essentially de novo based on the state law of the place where the employment relationship exists. If the court agrees with the Attorney General, the suit becomes an action against the United States that is governed by the FTCA. But if the court disagrees with the Attorney General's determination, the state-law tort suit may proceed against the defendant government employee in his or her personal capacity. *See Gutierrez de Martinez v. Lamagno*, 515 U.S.

417, 423-24, 434 (1995); *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006).

Harbury's case followed this procedural course. Among other claims, Harbury brought common-law tort claims against the individual CIA Defendants. In March 2000, Attorney General Reno certified that the individual CIA Defendants had acted within the scope of their employment. The Attorney General's certification removed the individual CIA Defendants from the tort action, substituted the United States as the sole party defendant, and rendered all of Harbury's tort claims subject to the FTCA and its exceptions, including the foreign-country exception.

Harbury then challenged the Attorney General's certification, arguing based on D.C. law that the individual CIA Defendants did not act within the scope of their employment. The District Court disagreed: It ruled that the FTCA applied to all of Harbury's tort claims and held that it lacked subject-matter jurisdiction because the claims fell within the FTCA's exception for claims "arising in a foreign country." 28 U.S.C. § 2680(k); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004) (foreign-country exception "bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred").

On appeal, Harbury argues that the individual CIA Defendants did not act within the scope of their employment under D.C. law because "acts of torture can never fall within the scope of employment." Harbury Br. at 14. According to Harbury, Attorney General Reno and the District Court erred in certifying the acts as within the individual CIA Defendants' scope of employment, the FTCA therefore does not apply, and Harbury can maintain tort claims against the individual

CIA Defendants in their personal capacities. To the extent the scope-of-employment certification was proper and Harbury's claims are converted into FTCA claims against the United States, Harbury separately argues that at least some of the claimed injuries, such as her emotional distress, occurred in the United States, and that the FTCA's foreign-country exception therefore does not bar those claims against the Government.[2]

## III

Pointing to recent cases from this Circuit, the Government contends that all of Harbury's claims pose "political questions" that the federal courts may not consider.

The political question doctrine is an important tenet of separation of powers and judicial restraint. But the doctrine is notorious for its imprecision, and the Supreme Court has relied on it only occasionally. As Judge Bork explained a generation ago, "That the contours of the doctrine are murky and unsettled is shown by the lack of consensus about its meaning among the members of the Supreme Court and among scholars." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J., concurring) (citations omitted). Judge Bork's observation remains true today.

---

[2] Unlike under the FTCA and the Westfall Act, no scope-of-employment certification process is available for *Bivens* claims against individual federal officials. But aliens such as Bamaca who were injured outside the United States typically cannot bring such constitutional claims. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990). This Court therefore previously dismissed *Bivens* claims that Harbury brought on behalf of her late husband. *See Harbury v. Deutch*, 233 F.3d 596, 602-04 (D.C. Cir. 2000).

The Supreme Court has held that the political question doctrine bars judicial resolution of certain issues textually and exclusively committed by the Constitution to one or both of the other branches of the Federal Government. *Baker v. Carr*, 369 U.S. 186, 217 (1962); *see also Nixon v. United States*, 506 U.S. 224 (1993); *Goldwater v. Carter*, 444 U.S. 996, 1002 (1979) (opinion of Rehnquist, J., for four Justices); *Gilligan v. Morgan*, 413 U.S. 1 (1973). The Court in *Baker* also held that the political question doctrine applies when there is a "lack of judicially discoverable and manageable standards for resolving" a case; in practice, however, this is often equivalent to a merits determination. 369 U.S. at 217; *see also Vieth v. Jubelirer*, 541 U.S. 267, 277-291 (2004) (plurality opinion).

Although those first two factors – textual commitment and lack of judicially manageable standards – are the most important, the Court also considers others: "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; "an unusual need for unquestioning adherence to a political decision already made"; and "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. As the *Baker* Court recognized in discussing those political question factors, judicial restraint in the area of foreign affairs is often appropriate because such cases "frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature." *Id.* at 211. The Court cautioned, however, that "it is error to suppose that every case or controversy which touches foreign relations lies beyond

judicial cognizance." *Id.* Instead, each case involves a "discriminating analysis of the particular question posed." *Id.*

Although the contours of the political question doctrine may be uncertain, this Court has relied on the doctrine in three recent cases that are indistinguishable from this case and control our decision here.

In *Schneider v. Kissinger*, children of a deceased Chilean general brought tort claims against former U.S. officials. 412 F.3d 190, 192 (D.C. Cir. 2005); *see also Schneider v. Kissinger*, 310 F. Supp. 2d 251, 257 (D.D.C. 2004) (describing claims). The plaintiffs alleged that, in 1970, then-National Security Advisor Henry Kissinger and then-CIA Director Richard Helms supported Chileans in Chile as they kidnapped, tortured, and killed General René Schneider during a military coup d'etat. 412 F.3d at 191-92. In response to the plaintiffs' charges against Kissinger and Helms, the Attorney General certified that both men had acted within the scope of their federal employment. *Id.* at 192.

This Court held that the case presented a nonjusticiable political question. *Id.* at 198. The Court explained that the suit challenged the merits of foreign policy decisions that the Constitution assigns to the political branches. *Id*. at 195. The Court also found a lack of judicially discoverable and manageable standards regarding "the government's use of covert operations in conjunction with political turmoil in another country." *Id.* at 197. Citing *Baker*, the Court stated that it could not entertain the lawsuit without expressing a lack of respect for a coordinate branch of the Government. *Id.* at 197-98.

This Court again applied the political question doctrine in *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260 (D.C. Cir. 2006). In that case, the plaintiffs brought tort claims against former

National Security Advisor Kissinger. *Id.* at 1263. According to the plaintiffs, after the U.S. Government and Kissinger supported the 1973 coup d'etat in Chile that installed Augusto Pinochet as President of the newly formed military junta, they supported a "Chilean terror apparatus" that "brutally repressed and attempted to eliminate individuals opposed to Pinochet's regime" – including the plaintiffs and their relatives. *Id.* at 1261 (internal quotation marks and alterations omitted). In response to the plaintiffs' charges, the Attorney General certified that Kissinger had acted within the scope of his employment as a U.S. official. *Id.* at 1262.

As in *Schneider*, the *Gonzalez-Vera* Court held that the plaintiffs' claims posed a nonjusticiable political question. The plaintiffs attempted to distinguish their case from *Schneider* by arguing that they challenged "specific acts of torture" that occurred after the coup d'etat rather than the "Government's policy decision to support Pinochet's rise to power." *Id.* at 1263 (internal quotation marks omitted). But this Court found that evaluating "the legal validity of those measures would require us to delve into questions of policy textually committed to a coordinate branch of government." *Id.* (internal quotation marks omitted). The Court also rejected the plaintiffs' attempt to characterize the defendants' actions as "*ultra vires*," noting that Kissinger had acted within the authority delegated to him by the President. *Id.* at 1264.

The third of this Court's cases that bears directly on the political question analysis is *Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006). In that case, former residents of the island of Diego Garcia sued several current and former officials of the Departments of Defense and State under international law. *Id.* at 430-31. The plaintiffs claimed that the U.S. Government and individual U.S. officials caused the forcible relocation, torture, and killing of island residents in

the 1960s as the Government depopulated the island to establish a military base. *Id.* In response to the plaintiffs' allegations, the Attorney General certified that the defendant government officials had acted within the scope of their employment. *Id.* at 431.

This Court concluded that the case presented a nonjusticiable political question because the "specific tactical measures allegedly taken" to depopulate Diego Garcia and build the base were "inextricably intertwined" with foreign policy questions – such as "the decision to establish a military base" and "the underlying strategy of establishing a regional military presence," neither of which was reviewable. *Id.* at 436. The *Bancoult* Court rejected the plaintiffs' efforts to distinguish between foreign policy and government officials' implementation of that policy. *Id.* at 436-37. Even if the individual defendants' "actions were not in conformance with presidential orders, the actions alleged were still closely enough connected to [their] employment to bring them within the ambit of the political question doctrine." *Id.* at 437. The individual defendants acted in pursuit of an authorized goal – establishing a military base – and as "high-level executive officers," they "inherently possessed a large measure of discretion in carrying out the tasks assigned to them by the President." *Id.* at 438. The Court held that "when the political question doctrine bars suit against the United States, this constitutional constraint cannot be circumvented merely by bringing claims against the individuals who committed the acts in question within the scope of their employment." *Id.*

Under our recent decisions in *Schneider*, *Gonzalez-Vera*, and *Bancoult*, the political question doctrine plainly applies to this case. In all three cases, as in Harbury's case, the Attorney General certified that the defendants had acted within the scope of their employment. *See Schneider*, 412

13

F.3d at 192; *Gonzalez-Vera*, 449 F.3d at 1262; *Bancoult*, 445 F.3d at 431. In *Schneider* and *Gonzalez-Vera*, as in Harbury's case, the plaintiffs contended that U.S. officials were responsible for physically abusing and killing foreign nationals in their home country. *Schneider*, 412 F.3d at 191-92; *Gonzalez-Vera*, 449 F.3d at 1261. And although the plaintiffs in all three cases argued that they challenged specific acts and not general Executive Branch foreign policy decisions, this Court reasoned that the cases sought determinations whether the alleged conduct *should* have occurred, which impermissibly would require examining the wisdom of the underlying policies. *Schneider*, 412 F.3d at 197; *Gonzalez-Vera*, 449 F.3d at 1263-64; *Bancoult*, 445 F.3d at 436.[3]

---

[3] In all three cases, as in Harbury's case, the Attorney General certified that the government officials had acted within the scope of their foreign policy or national security employment. In tort cases arising in the national security or foreign policy context – such as *Schneider*, *Gonzalez-Vera*, and *Bancoult* – the political question doctrine counsels strongly against judicial second-guessing of the Attorney General's certification for much the same reason that courts are cautious about entertaining the merits of the tort claims: Doing so would require courts to intrude deeply into the foreign policy and national security decisionmaking process of the Executive Branch. *See Christopher v. Harbury*, 536 U.S. 403, 417 (2002) ("The action alleged on the part of all the Government defendants . . . was apparently taken in the conduct of foreign relations by the National Government. Thus, if there is to be judicial enquiry, it will raise concerns for the separation of powers in trenching on matters committed to the other branches."); *cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004); *Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004). On the other hand, the political question doctrine ordinarily would not apply to a tort case against an individual government official when the Attorney General has affirmatively declined to issue a scope-of-employment

In sum, we find no remotely plausible basis to distinguish this case from *Schneider*, *Gonzalez-Vera*, and *Bancoult*. Therefore, under our precedents, we must dismiss Harbury's claims based on the political question doctrine.

IV

A recent decision of this Court considered allegations similar to Harbury's and did not rely on the political question doctrine. *See Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008). Even if we likewise do not rely on the political question doctrine, however, we still affirm the dismissal of Harbury's case on alternative jurisdictional grounds. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999). The FTCA applies to Harbury's tort claims, and the FTCA bars suits based on injuries suffered in a foreign country.

In *Rasul*, former detainees at the U.S. Naval Base at Guantanamo Bay, Cuba, sued a former Secretary of Defense and several military officers in their personal capacities, alleging wrongful detention, physical abuse, and "cruel, inhuman or degrading treatment." 512 F.3d at 651. In response to the charges, the Attorney General issued a Westfall Act certification that the individual defendants had acted within the scope of their employment, thereby converting the claims against the individual officials into FTCA claims against the United States. *Id.* at 655. The Court then dismissed the FTCA claims against the Government for lack of subject-matter jurisdiction because the plaintiffs had

---

certification: It commonly would make little sense to dismiss an otherwise cognizable tort case against an Executive Branch official as a "political question" when the Executive Branch itself disclaimed the conduct and concluded that the official acted *outside* the scope of employment.

failed to exhaust their administrative remedies as required by the FTCA.  *Id.* at 661; *see also* 28 U.S.C. § 2675(a).

In the *Rasul* litigation, the Government did not argue that the case was nonjusticiable under the political question doctrine.  And this Court did not address that doctrine or our decisions in *Schneider*, *Gonzalez-Vera*, or *Bancoult*.

The *Rasul* Court instead considered the detainees' challenge to the Attorney General's scope-of-employment certification.  Applying D.C. law, the Court held that the defendants' alleged conduct fell within the scope of their employment because the alleged wrongful acts were "tied exclusively to the plaintiffs' detention in a military prison and to the interrogations conducted therein."  512 F.3d at 658 (internal quotation marks omitted).  The alleged torts therefore were "incidental to the defendants' legitimate employment duties" in detaining and interrogating suspected enemy combatants.  *Id.* at 659.  The Court rested its scope-of-employment analysis on several D.C. cases holding that seriously criminal and violent conduct can still fall within the scope of a defendant's employment under D.C. law – including sexual harassment, a shooting, armed assault, and rape.  *See id.* at 657-58 (citing *Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984) (university dean acted within scope of employment in sexually harassing faculty member during meetings); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (laundromat employee acted within scope of employment in shooting customer during dispute over removing clothes from washing machine); *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976) (mattress deliveryman acted

within scope of employment in raping customer after dispute arose during delivery)).[4]

Under D.C. law as applied in *Rasul*, the individual CIA Defendants in this case similarly acted within the scope of their employment. Their jobs involved hiring and managing informants, conducting covert operations, and gathering intelligence. *See* 50 U.S.C. §§ 403-4(b), 403-4a(d). In performing those responsibilities, they allegedly gathered information related to a decades-long civil war in Guatemala and worked with individuals in Guatemala who abused and killed Harbury's husband. Under D.C. law, those actions were incidental to their authorized conduct: The actions were "foreseeable" as a "direct outgrowth" of their responsibility to gather intelligence and were "undertaken on the [Government's] behalf." *Rasul*, 512 F.3d at 657 (internal quotation marks omitted). Although Harbury alleges that her husband suffered physical abuse, that does not alter the scope-of-employment analysis: The *Rasul* decision – and the D.C.

---

[4] At first blush, D.C. scope-of-employment law might seem counterintuitive. How could committing physical abuse, for example, be within the scope of an individual's employment? The explanation is straightforward: Many states and D.C. apply the scope-of-employment test very expansively, in part because doing so usually allows an injured tort plaintiff a chance to recover from a deep-pocket employer rather than a judgment-proof employee. *See* RESTATEMENT (THIRD) OF AGENCY § 2.04 cmt. b (2006) ("Respondeat superior . . . reflects the likelihood that an employer will be more likely to satisfy a judgment."). The scope-of-employment test often is akin to asking whether the defendant merely was on duty or on the job when committing the alleged tort. Because of the broad scope-of-employment standard in many states and D.C., and because the FTCA and the Westfall Act incorporate the relevant state's test, tort claims against federal government employees often proceed against the Government itself under the FTCA rather than against the individual employees under state law.

cases on which the *Rasul* Court relied – hold that allegations of physical abuse still fall within the scope of employment if such actions were foreseeable. *See id.* at 660 ("[T]he tortious conduct was triggered or motivated or occasioned by the conduct then and there of the employer's business even though it was seriously criminal.") (internal quotation marks and alterations omitted); *see also Lyon*, 533 F.2d at 655; *Weinberg*, 434 A.2d at 409; RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958).

Because the alleged actions of the individual CIA Defendants were within the scope of their employment, Harbury's claims against the individual CIA Defendants are properly converted into claims against the Government under the FTCA. But Harbury's FTCA claims against the Government fall squarely within the FTCA's exception for claims "arising in a foreign country." 28 U.S.C. § 2680(k). In particular, Harbury's claims on behalf of her husband's estate arise in Guatemala because he suffered the alleged injuries there. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 700-01 (2004). And to the extent Harbury alleges her own emotional injuries in the United States as a result of the death of her husband, those derivative claims similarly arise in Guatemala for purposes of the FTCA because they are based entirely on the injuries her husband suffered there. A plaintiff in Harbury's situation cannot plead around the FTCA's foreign-country exception simply by claiming injuries such as "emotional distress" that are derivative of the foreign-country injuries at the root of the complaint. Much like the now-defunct "headquarters doctrine," that practice would threaten to "swallow the foreign country exception whole." *Id.* at 703; *see also Harbury v. Hayden*, 444 F. Supp. 2d 19, 43 (D.D.C. 2006). We follow the lead of *Sosa* and decline to allow this kind of creative pleading to water down the foreign-country exception to the FTCA.

In sum, even apart from the political question doctrine, we lack subject-matter jurisdiction to consider Harbury's tort claims because the FTCA applies and the claims fall within that statute's foreign-country exception.[5]

---

[5] Harbury also argues that count 28 of her complaint raised a claim against the individual CIA Defendants under the Torture Victim Protection Act. As the District Court held, however, count 28 asserted only a common-law international tort claim that, like Harbury's other tort claims, was converted into an FTCA claim against the United States by the Attorney General's proper scope-of-employment certification. *See Harbury v. Hayden*, 444 F. Supp. 2d 19, 37-43 (D.D.C. 2006). Even if Harbury's complaint had asserted a TVPA claim, moreover, the claim would pose a nonjusticiable political question under our precedents. *See, e.g.*, *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir. 2006) (TVPA claim, "like any other, may not be heard if it presents a political question"). (Judge Williams would affirm the dismissal of count 28 solely on political question grounds and not on the alternative ground that Harbury failed to state a claim under the TVPA. In support of that view, he points to the language in count 28 claiming that the individual CIA Defendants participated or collaborated in torture and extrajudicial execution in violation of "the law of the United States," and to two prior opinions of the District Court (those of March 9, 2000, and March 13, 2001, *see* J.A. 112, 119) characterizing Harbury as having "name[d]" the TVPA as a basis for count 28.)

Apart from those defects, to state a TVPA claim, Harbury would still have to clear the hurdle of showing that the individual CIA Defendants – who are of course *American* officials – acted "under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 note; *see also Arar v. Ashcroft*, 414 F. Supp. 2d 250, 266 (E.D.N.Y. 2006). Because Harbury's complaint did not allege a TVPA claim and because such a claim would pose a nonjusticiable political question, we need not address the scope of the TVPA as applied to U.S. officials, however.

19

\* \* \*

We affirm the District Court's judgment dismissing Harbury's suit.

*So ordered.*