KAVANAUGH, Circuit Judge,
with whom
Chief Judge SENTELLE joins, and with whom Circuit Judges GINSBURG and ROGERS join as to Part I, concurring in the judgment:
In August 1998, President Clinton ordered the U.S. military to bomb both the El-Shifa factory in Sudan and al Qaeda training camps in Afghanistan. The goals were to kill leaders of al Qaeda and to destroy al Qaeda infrastructure. President Clinton explained to Congress and the American people that he ordered the bombings in furtherance of the Nation’s “inherent right of self-defense” in the wake of al Qaeda attacks on U.S. property and personnel in Kenya and Tanzania. As authority for the bombings, President Clinton cited his Commander-in-Chief power under Article II of the Constitution.
Plaintiffs El-Shifa Pharmaceutical Industries Company and its owner, Salah Idris, allege that their factory in Sudan was wrongly destroyed in the bombings and that they were reputationally harmed by later Executive Branch statements linking them to Osama bin Laden. As relevant here, they have brought a federal defamation claim and an Alien Tort Statute claim against the United States.
The Government correctly contends that plaintiffs have not alleged a cognizable cause of action; indeed, plaintiffs have not come close. Plaintiffs’ complaint should be dismissed on that basis alone, as Part I of this opinion explains. But the majority opinion instead relies on the political question doctrine to dismiss the complaint. I disagree with the majority opinion’s political question analysis, as Part II of this opinion spells out.
I
Federal courts lack subject matter jurisdiction over claims that are “so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.” Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (inter *853 nal quotation marks omitted). Plaintiffs’ two claims in this case fall into that category.
El-Shifa Pharmaceutical Industries Company operated a factory in Sudan that was bombed in August 1998 by the United States military, at the specific direction of President Clinton. In later press reports, anonymous U.S. Government officials were quoted as linking El-Shifa and its owner, Idris, to Osama bin Laden. El-Shifa and Salah Idris then sued the United States, advancing two claims of relevance here. First, to obtain relief for the allegedly false statements by Government officials that had linked plaintiffs to bin Laden, plaintiffs raised a federal defamation claim against the United States. The problem for plaintiffs is that there is no federal cause of action for defamation available against the United States. Second, plaintiffs claimed that the failure of the United States to compensate them for the allegedly mistaken bombing and destruction of their property violated a customary international law norm recognized under the Alien Tort Statute, 28 U.S.C. § 1350. But plaintiffs have cited no customary international law norm that would require compensation by the United States under the Alien Tort Statute for mistaken war-time bombings.
A
First, plaintiffs assert a federal defamation claim against the United States. There is no such cause of action.
Congress has enacted a number of causes of action that can be brought against the United States or against Government officials for acts taken in their official capacities. See, e.g., Administrative Procedure Act, 5 U.S.C. § 500 et seq.-, Federal Tort Claims Act, 28 U.S.C. § 1346; Westfall Act, 28 U.S.C. § 2679; Tucker Act, 28 U.S.C § 1491, 28 U.S.C. § 1346(a)(2). But Congress has not created a defamation cause of action against the United States.
Moreover, the Supreme Court has never recognized a federal common-law defamation cause of action against the United States. Indeed, the Court has not endorsed any federal common-law causes of action against the Government during the post-Ane period. And the Court several times has expressly declined to do so, noting that creation of new causes of action is a function typically best left to Congress. See, e.g., U.S. Postal Serv. v. Flamingo Indus., 540 U.S. 736, 744-5, 124 S.Ct. 1321, 158 L.Ed.2d 19 (2004); Alexander v. Sandoval, 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); O’Melveny & Myers v. FDIC, 512 U.S. 79, 88, 114 S.Ct. 2048,129 L.Ed.2d 67 (1994); FDIC v. Meyer, 510 U.S. 471, 483-86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); United States v. California, 507 U.S. 746, 759-60, 113 S.Ct. 1784, 123 L.Ed.2d 528 (1993); United States v. Standard Oil Co., 332 U.S. 301, 313-16, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947).
Plaintiffs cite three cases from this Court to support their argument that there is a federal common-law cause of action for defamation available against the United States. See U.S. Info. Agency v. Krc, 989 F.2d 1211, 1216 (D.C.Cir.1993); Cmty. for Creative Non-Violence v. Pierce, 814 F.2d 663, 672 (D.C.Cir.1987); Expeditions Unlimited Aquatic Enters, v. Smithsonian Inst., 566 F.2d 289, 294 n. 16 (D.C.Cir.1977) (en banc). But none of those decisions holds that there is such a federal common-law cause of action.
In this Court, plaintiffs also attempt to argue that the Administrative Procedure Act supplies a cause of action for defamation. But that, too, is wrong; the APA contains no cause of action for defamation. *854 Moreover, plaintiffs cannot use the APA— which, as relevant here, prohibits executive action that is “not in accordance with law” — to vindicate a purported federal common-law right that does not exist. 5 U.S.C. § 706(2)(a); see also Sear-Land Serv., Inc. v. Alaska R.R., 659 F.2d 243, 245 (D.C.Cir.1981).
In addition to a federal common-law cause of action, plaintiffs might also be alleging a purported state common-law cause of action against the United States, although their complaint never quite says as much. Even so, any such state-law cause of action may not be brought against the United States absent congressional authorization to that effect. Cf. Tarble’s Case, 13 Wall. 397, 80 U.S. 397, 406, 20 L.Ed. 597 (1871); Barr v. Matteo, 360 U.S. 564, 569-71, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (federal officers acting in their official capacities have immunity from suit, including against state-law defamation suits). In our constitutional system, the states do not regulate the Federal Government, either directly or through state tort law, at least absent congressional consent. U.S. Const, art. VI, cl. 2. The FTCA and Westfall Act do expressly borrow (or permit) state tort causes of action against the United States in certain carefully defined circumstances. But those statutes do not apply here, as plaintiffs concede. And contrary to plaintiffs’ inventive arguments, the APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States. As counsel for the Government succinctly and correctly stated at oral argument: “State tort law doesn’t run against the United States, so it’s not a federal law that can be pointed to as a substantive law which is being transgressed for an APA cause of action.” Tr. of Oral Arg. at 52; see In re Supreme Beef Processors, Inc., 468 F.3d 248, 255 (5th Cir.2006).[1]
B
Plaintiffs also seek a declaration that the United States violated customary international law, as cognizable under the Alien Tort Statute, 28 U.S.C. § 1350, because the United States failed to compensate plaintiffs for the allegedly mistaken destruction of their property.
The Alien Tort Statute, or ATS, authorizes suits brought “by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. The ATS covers “a relatively modest set of actions alleging violations of the law of nations” — including certain norms established as of 1789, which the Court identified as “violation of safe conducts, infringement of the rights of ambassadors, and piracy.” Sosa v. AlvarezMachain, 542 U.S. 692, 720, 724, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). The ATS may encompass other established customary international law norms so long as they do not have “less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted” in 1789. Id. at 732, 124 S.Ct. 2739.
Plaintiffs allege that the actions of the United States violated an established customary international law norm — namely, “the obligation of a government to compensate citizens of other nations for the *855 mistaken destruction of their innocent property.” El-Shifa Br. at 49 n. 6. But plaintiffs cite no authority suggesting that the mistaken destruction of property during extraterritorial war-related activities— or denial of an administrative claim seeking compensation for the same — violates an established norm of customary international law. Furthermore, “the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.” Sosa, 542 U.S. at 732-33, 124 S.Ct. 2739. If the plaintiffs were correct, the federal courts presumably would be flooded with ATS claims — at a minimum, claims seeking declaratory relief for alleged violations of customary international law norms— against the United States for allegedly mistaken property damage in every war, including the ongoing wars in Iraq and Afghanistan. Plaintiffs provide no persuasive reason for the federal judiciary to embark on such a novel and far-reaching endeavor in the absence of congressional direction.
In short, plaintiffs’ attorneys have worked hard to find some basis in law for plaintiffs’ complaint. But they have located no such basis: Plaintiffs’ two claims are “so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.” Steel Co., 523 U.S. at 89, 118 S.Ct. 1003. The District Court’s judgment dismissing plaintiffs’ complaint should be affirmed for that reason alone.[2]
II
The straightforward approach outlined in Part I of this opinion would readily resolve this case. But the majority opinion instead relies on the notoriously “murky and unsettled” political question doctrine to dismiss the complaint. Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 n. 8 (1984) (Bork, J., concurring). Because of the importance of the political question doctrine to the law of this Circuit, I believe it important to respond to the majority opinion and to explain my disagreement with its political question theory.
The key point for purposes of my political question analysis is this: Plaintiffs do not allege that the Executive Branch violated the Constitution. Rather, plaintiffs allege that the Executive Branch violated congressionally enacted statutes that purportedly constrain the Executive. The Supreme Court has never applied the political question doctrine in cases involving statutory claims of this kind. As Judge Edwards has correctly explained, the proper separation of powers question in this sort of statutory case is whether the statute as applied infringes on the President’s exclusive, preclusive authority under Article II of the Constitution. See Zivotofsky v. Sec’y of State, 571 F.3d 1227, 1240-45 (D.C.Cir.2009) (Edwards, J., concurring). That is a weighty question — and one that must be confronted directly through careful analysis of Article II, not resolved sub silentio in favor of the Executive through use of the political question doctrine.
*856 A
The political question doctrine has occupied a more limited place in the Supreme Court’s jurisprudence than is sometimes assumed.[3] The Court has relied on the doctrine only twice in the last 50 years. See Walter Nixon v. United States, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). The Court has invoked the doctrine in cases in which (i) the Constitution textually and exclusively commits interpretation of the relevant constitutional provision to one or both of the political branches or (ii) the constitutional provision at issue supplies no judicially manageable or discoverable standards for resolving the case. See Walter Nixon, 506 U.S. at 228, 113 S.Ct. 732.
Importantly, the Supreme Court has invoked the political question doctrine only in cases alleging violations of the Constitution. This is a statutory case. The Supreme Court has never applied the political question doctrine in a case involving alleged statutory violations. Never.
As the Supreme Court has explained, the interpretation of legislation is a “recurring and accepted task for the federal courts.” Japan Whaling Ass’n v. American Cetacean Soc’y, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). Under Article III of the Constitution, “one of the Judiciary’s characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones.” Id.; see also 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3534.2, at 752 (3d ed. 2008) (“[Ijnterpretation of statutes affecting foreign affairs is not likely to be barred by [the] political-question doctrine.”); Erwin Chemerinsky, Federal Jurisdiction § 1.3, at 15 (5th ed. 2007) (“Under current law, the political question doctrine consigns certain allegations of constitutional violations to the other branches of government for adjudication and decision, even if all other jurisdictional and justiciability requirements are met.”) (emphasis added).[4]
*857 There is good reason the political question doctrine does not apply in cases alleging statutory violations. If a court refused to give effect to a statute that regulated Executive conduct, it necessarily would be holding that Congress is unable to constrain Executive conduct in the challenged sphere of action. As a result, the court would be ruling (at least implicitly) that the statute intrudes impermissibly on the Executive’s prerogatives under Article II of the Constitution. In other words, the court would be establishing that the asserted Executive power is exclusive and preclusive, meaning that Congress cannot regulate or limit that power by creating a cause of action or otherwise.
Applying the political question doctrine in statutory cases thus would not reflect benign deference to the political branches. Rather, that approach would systematically favor the Executive Branch over the Legislative Branch — without the courts’ acknowledging as much or grappling with the critical separation of powers and Article II issues. The fact that use of the political question doctrine in statutory cases loads the dice against the Legislative Branch presumably explains why there is no Supreme Court precedent applying the doctrine in statutory cases' — and why the Executive Branch (sometimes wary, for a variety of reasons, of advancing a straight Article II argument) may want the courts to invoke the doctrine in statutory cases of this sort. Cf David J. Barron & Martin S. Lederman, The Commander in Chief at the Lowest Ebb — Framing the Problem, Doctrine, and Original Understanding, 121 Harv. L.Rev. 689, 723-24 (2008) (“One need only consider the cases that could arise in the contemporary setting to see that leaving the question of the President’s constitutional authority to defy a statutory restriction on his war powers to the give- and-take of the political branches would be quite radical in its implications.... [T]he insistence that allocation of war powers should be ‘left to politics’ would hardly be a neutral solution to the problem: it would inevitably tilt the constitutional structure decidedly in favor of executive supremacy.”).
In short, the question whether a statute intrudes on the Executive’s exclusive, preclusive Article II authority must be confronted directly through careful analysis of Article II — not answered by backdoor use of the political question doctrine, which may sub silentio expand executive power in an indirect, haphazard, and unprincipled manner. It is particularly important to confront the question directly because of the significance of such questions to our constitutional separation of powers. As Justice Jackson rightly explained, any claim of exclusive, preclusive Executive authority — particularly in the national security arena^ — -“must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 638, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).
B
The approach suggested in this opinion is consistent with the results, if not all the reasoning, of this Court’s recent cases declining to entertain certain tort suits in the national security arena. In those cases, as in this case, the plaintiffs asserted no cognizable cause of action. See Harbury v. Hayden, 522 F.3d 413 (D.C.Cir.2008); Gonzalez-Vera v. Kissinger, 449 F.3d 1260 (D.C.Cir.2006); Bancoult v. McNamara, *858 445 F.3d 427 (D.C.Cir.2006); Schneider v. Kissinger, 412 F.3d 190 (D.C.Cir.2005). The Federal Tort Claims Act does not apply to suits for actions that occur in foreign countries or that encompass discretionary functions, among other exceptions. The Alien Tort Statute has never been held to cover suits against the United States or United States Government officials; the statute furnishes no waiver of sovereign immunity. And as we explained in Harbury, the Torture Victim Protection Act does not extend to suits against American officials except in the unusual case where such an official acts “under color of foreign law.”
The absence of a cause of action covering the national security activities at issue in Harbury, Gonzalez-Vera, Bancoult, Schneider, or this case is hardly surprising. The political branches, mindful of the need for Executive discretion and flexibility in national security and foreign affairs, are unlikely to unduly hamper the Executive’s ability to protect the Nation’s security and diplomatic objectives. See United States v. Curtiss-Wright Export Coup., 299 U.S. 304, 320-22, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Relatedly, it is well-established that courts must be cautious about interpreting an ambiguous statute to constrain or interfere with the Executive Branch’s conduct of national security or foreign policy. See Dep’t of the Navy v. Egan, 484 U.S. 518, 529-30, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988); United States v. Johnson, 481 U.S. 681, 690-91, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987); Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); see also Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).[5] And apart from all that, if a statute were passed that clearly limited the kind of Executive national security or foreign policy activities at issue in these cases, such a statute as applied might well violate Article II. Cf. Zivotofsky, 571 F.3d at 1240-45 (Edwards, J., concurring).
The main point here is that those issues should be confronted directly and carefully, not resolved sub silentio in favor of the Executive through invocation of the political question doctrine in a situation where the Supreme Court has never seen fit to employ it.
C
To say that the courts must directly confront the critical separation of powers and Article II issues posed by this kind of statutory case is not to say that the Executive lacks any exclusive, preclusive Article II authority. The Executive plainly possesses a significant degree of exclusive, preclusive Article II power in both the domestic and national security arenas. See, e.g., Ex parte Garland, 4 Wall. 333, 71 U.S. 333, 380, 18 L.Ed. 366 (1867) (pardon power “of the President is not subject to legislative control.”).
In the national security realm, although the topic is of course hotly debated, most acknowledge at least some areas of exclusive, preclusive Presidential power — where Congress cannot regulate and the Executive “wins” even in Justice Jackson’s Youngstown Category Three. For example, courts have generally accepted that the President possesses exclusive, preclu *859 sive power under the Commander-in-Chief Clause of Article II to command troop movements during a congressionally authorized war. See Harridan v. Rumsfeld, 548 U.S. 557, 591-92, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (“neither can the President, in war more than in peace, intrude upon the proper authority of Congress, nor Congress upon the proper authority of the President.... Congress cannot direct the conduct of campaigns”) (quoting Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 139, 18 L.Ed. 281 (1866) (separate opinion of Chase, C.J.)).
This case involves President Clinton’s unilateral decision to bomb suspected al Qaeda targets. In the wake of the August 1998 al Qaeda attacks on U.S. personnel and property in Tanzania and Kenya, President Clinton ordered these attacks “in exercise” of the United States’ “inherent right of self-defense.” Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 Pub. Papers 1464 (Aug. 21, 1998). As authority for the bombings, President Clinton cited his Commander-in-Chief power under Article II.
A statute regulating or creating a cause of action to challenge the President’s short-term bombing of foreign targets in the Nation’s self-defense (or contesting the Executive Branch’s subsequent statements about it as defamatory) might well unconstitutionally encroach on the President’s exclusive, preclusive Article II authority as Commander in Chief. Cf. Prize Cases, 67 U.S. 635, 668, 2 Black 635, 17 L.Ed. 459 (1863) (“If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority.”); 4A Op. Off. Legal Counsel 185 (1980).
But we need not definitively answer the sensitive and weighty Article II question in this case. As explained in Part I of this opinion, Congress has not created any cognizable cause of action that would apply to President Clinton’s decision to bomb El-Shifa or later Executive Branch statements about the bombing. Indeed, the only remotely relevant statute in this case is the War Powers Resolution, which seems to support the President’s authority to conduct unilateral military operations for at least 62 days without specific congressional approval. See 50 U.S.C. § 1544(b).
Given that no cause of action exists here, the political question and Article II issues in this case have an abstract and hypothetical ah- to them. In these circumstances, we would be wise to heed Justice Jackson’s cautionary words. We should decline the opportunity to expound on the scope of the President’s exclusive, preclusive Commander-in-Chief authority under Article II. I respectfully disagree with the majority opinion’s doing so — and particularly its doing so indirectly through reliance on the political question doctrine.
I would dismiss plaintiffs’ complaint because plaintiffs’ two claims are “so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.” Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

. Plaintiffs have not contended that the relevant agency actions were arbitrary and capricious under the APA. Even if they had, they would face a variety of hurdles — including 5 U.S.C. § 701(a)(2), which exempts from APA review agency action that is committed to agency discretion by law. Furthermore, any such APA claim would rest on the proposition that the statements of anonymous officials constitute final agency action. See 5 U.S.C. § 704. There is no support in our precedents for that conclusion.

. If a majority of the Court had been willing to dismiss plaintiffs' claims on this basis for lack of subject-matter jurisdiction, the Court could have avoided the need to confront the significant constitutional question whether plaintiffs' claims raise a nonjusticiable political question. Cf. Nw. Austin Mun. Util. Dist. No. One v. Holder, — U.S. -, 129 S.Ct. 2504, 2513, 174 L.Ed.2d 140 (2009).

. The Supreme Court does not decline to resolve a case on political question grounds simply because the dispute involves or would affect national security or foreign relations. Indeed, from the time of John Marshall to the present, the Court has decided many sensitive and controversial cases that had enormous national security or foreign policy ramifications. See, e.g., Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); Medellin v. Texas, 552 U.S. 491, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006); Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); American Ins. Ass’n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003); Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct 216, 81 L.Ed. 255 (1936); Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281 (1866); Prize Cases, 67 U.S. 635, 2 Black 635, 17 L.Ed. 459 (1863); Little v. Bárreme, 2 Cranch 170, 6 U.S. 170, 2 L.Ed. 243 (1804); see also David J. Barron & Martin S. Lederman, The Commander in Chief at the Lowest Ebb — Framing the Problem, Doctrine, and Original Understanding, 121 Harv. L.Rev. 689, 723 (2008) (“the Supreme Court's jurisprudence, stretching from early in our history through Youngstown to numerous contemporary war powers cases, is rife with instances of the Court's resolving questions of the Executive’s war powers, just as it has adjudicated other separation of powers disputes between the political departments”).

. If a statute regulating private conduct provides no discernible standards and therefore insufficient notice of what actions are prohib *857 ited, the statute might be void for vagueness under the Due Process Clause. See Bouie v. City of Columbia, 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). But that is not a political question doctrine determination.

. In cases reviewing the Executive's designation of foreign terrorist organizations, we held that the statute left to the Executive Branch the determination whether a group threatened the security of the United States. See People’s Mojahedin v. Dep’t of State, 182 F.3d 17, 23-25 (D.C.Cir.1999). This seems a straightforward application of Dep’t of the Navy v. Egan’s principle of statutory interpretation, not any broad holding about the political question doctrine.