# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 18, 2013          Decided July 19, 2013

No. 12-5115

MICHAEL S. OAKEY,
APPELLANT

v.

US AIRWAYS PILOTS DISABILITY INCOME PLAN,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:03-cv-02373)

*Anthony F. Shelley* argued the cause for the appellant. *Timothy P. O'Toole* was with him on brief. *Jeffrey M. Hahn* entered an appearance.

*Mark W. Robertson* argued the cause for the appellee. *Everett C. Johnson, Jr.* entered an appearance.

Before: HENDERSON, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Michael S. Oakey, a former pilot for U.S. Airways, Inc. (US Airways), appeals the district court's dismissal of Oakey's claim under the Employee Retirement Income Security Act (ERISA), 29

U.S.C. §§ 1001 et seq., seeking benefits from a collectively-bargained pilot disability plan. We conclude that section 204 of the Railway Labor Act (RLA), 45 U.S.C. §§ 151 et seq., vests in the "applicable adjustment board" exclusive jurisdiction over Oakey's claim because it is grounded in the application and interpretation of a collective bargaining agreement. Accordingly, we affirm the dismissal for lack of jurisdiction.

## I.

### *A. Statutory Background*

ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans" and "to provide a uniform regulatory regime over employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). ERISA requires notice of the denial of an employee disability claim, " 'setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant,' " and a reasonable opportunity for a " 'a full and fair review' " of the denial. *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 492 (D.C. Cir. 1998) (quoting 29 U.S.C. § 1133). ERISA also grants a disability claimant the right to "sue 'to recover benefits due to him under the terms of his plan.' " *Fitts v. Fed. Nat'l. Mortg. Ass'n*, 236 F.3d 1, 4 (D.C. Cir. 2001) (quoting 29 U.S.C. § 1132(a)(1)(B)). Its "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement" that the Congress intended to be "exclusive" and to preempt "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy." *Davila*, 542 U.S. at 208-09 (quotation marks omitted); *see* 29 U.S.C. § 1144. Exclusive jurisdiction over an ERISA-based claim lies in federal district court. *Bd. of Trustees of Hotel & Rest. Emps. Local 25 v. Madison Hotel,*

*Inc.*, 97 F.3d 1479, 1483-84 (D.C. Cir. 1996) (citing 29 U.S.C. § 1132(e)(1)).

The more narrowly focused RLA was initially limited to the railroad industry but has been applied to disputes between air carriers and their employees since 1936. *Air Line Pilots Ass'n, Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 88 (D.C. Cir. 1988) (citing 45 U.S.C. § 181 (1982)); *see also Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 685-86 (1963)). It was enacted "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). Under section 204 of the RLA, such disputes "growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . may be referred by petition of the parties or by either party to an appropriate adjustment board." 45 U.S.C. § 184. Each air carrier has a duty "to establish a board of adjustment," *id*., and the statutory grievance procedure is " 'mandatory, exclusive, and comprehensive,' " *Delta Airlines*, 863 F.2d at 88 (quoting *Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 38 (1963)). Judicial review of the board of adjustment's decision is limited to three categories expressly set out in the RLA. *Id*. (citing *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 93 (1978); 45 U.S.C. § 153 First (p)).

### B. Factual Background

Oakey was employed as an airline pilot by US Airways from 1988 to 2002 and was enrolled in the US Airways Pilot Disability Plan (Plan), which initially took effect on January 1, 1975—the effective date of ERISA—as the result of collective bargaining between US Airways' predecessor (Allegheny Airlines) and the Air Line Pilots Association (ALPA). The original Plan agreement contained the following provision governing the term of its coverage: "Each

pilot will become covered for benefits on the date he is employed and is classified as being in active service. If a pilot becomes classified as being other than in active service, he will no longer be covered as of the date of such change in employment status." Allegheny Airlines Pilot's Long Term Disability & Loss of License Plan (1975 Disability Plan) art. 5.1 (Jan. 1, 1975) (JA 593). The 1975 Disability Plan does not define "active service" or address the effect of a pilot's furlough status on benefits eligibility. In 1997, however, US Airways produced an "amended and restated" version of the plan. USAir, Inc. Pilot Disability Plan (effective Feb. 18, 1997) (1997 Amendment) (JA 63). The 1997 Amendment is signed by a US Airways officer but not by an ALPA representative. *Id*. at 18-19. It defines "active service" as "those periods during which the Employee is in active payroll status with the Employer," *id*. art. 1.2, and specifically provides that "[b]enefits payable [t]hereunder shall cease upon . . . the date the Participant is placed on furlough status from the Employer," *id*. art. 3.6.

Under both the 1975 Disability Plan and the 1997 Amendment, benefit claims are reviewed and decided by the US Airways Retirement Board, *see also* Letter of Agreement Between US Air, Inc. and the airline Pilots re: RETIREMENT BOARD (JA 558) § 1.6. (Feb. 9, 1990). The Retirement Board consists of four members—two selected by US Airways and two by ALPA. A decision by agreement of three or more Retirement Board members is "final and binding." *Id*. Absent such agreement, an "Impartial Referee" is designated to sit as a fifth member of the Retirement Board and a subsequent decision by three or more members is then "final and binding upon all parties." *Id*. § 2.1.

In 2001, after he was diagnosed with leukemia, Oakey submitted a claim for disability benefits to the Retirement Board, which approved the claim effective January 30, 2002.

The following January, US Airways notified Oakey he was to be "furloughed" effective February 4, 2003 as part of a fleet reduction. Letter of US Airways to Michael S. Oakey (Jan. 9, 2003) (JA 441). On March 11, 2003, the Administrator of the Plan (Administrator) advised Oakey that, based on his furlough date, his disability benefits had terminated on February 4, 2003.

Oakey subsequently requested, through legal counsel, that the Administrator provide a "copy of the disability policy." Letter from Bruce E. Woodske to ING at 1 (Mar. 25, 2003) (JA 175). Oakey's counsel was referred to US Airways, which transmitted a copy of Article 3.6 of the 1997 Amendment stating, to repeat, that disability benefits cease on the date a participant is "placed on furlough status." Facsimile from US AIRWAYS to Bruce E. Woodske (Apr. 1, 2003) (JA 182). Oakey's counsel subsequently requested "the entire benefits plan with all amendments to the present." Facsimile from Bruce E. Woodske to US Airways (Apr. 21, 2003) (JA 190). Nonetheless, Oakey "never received a copy of the Disability Plan from US Airways, despite the requirement of ERISA § 104(b)(4), 29 U.S.C. § 1104(b)(4), that such plan documents be provided promptly upon request." Second Am. Compl. (Compl.) ¶ 27. In August 2003, Oakey took early (and reduced) retirement.

In November 2003, Oakey and six other retired US Airways pilots filed an action under ERISA against, inter alia, US Airways and the Plan for benefits allegedly owed. On October 21, 2011, Oakey, the only remaining plaintiff, filed a "Second Amended Complaint" (Complaint) against the Plan, the only remaining defendant, alleging a single claim for unpaid benefits resulting from the wrongful termination of his disability benefits in February 2003. The Complaint asserts that the 1997 Amendment was ineffective because it was not signed by an ALPA representative, Compl. ¶¶ 7-10, and that

Oakey's disability coverage was therefore governed by the 1975 Disability Plan, which does not terminate benefits upon an employee's furlough.  Compl. ¶¶ 10, 40-42.

On December 12, 2011, the Plan moved under Fed. R. Civ. P. 12(b)(1) to dismiss for lack of subject matter jurisdiction on the ground that the RLA's mandatory arbitration provision deprived the district court of jurisdiction. On March 19, 2012, the district court granted the Plan's motion and dismissed the action.  *Oakey v. U.S. Airways Pilots Disability Income Plan*, 839 F. Supp. 2d 225 (D.D.C. 2012).  Oakey timely appealed.

## II.

We review *de novo* the district court's grant of a motion to dismiss for lack of subject matter jurisdiction.  *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 606 F.3d 780, 786 (D.C. Cir. 2010) (quotation marks omitted). For the reasons set out below, we agree with the district court's Rule 12(b)(1) dismissal.

In *Air Line Pilots Association, International v. Northwest Airlines, Inc.*, 627 F.2d 272 (D.C. Cir. 1980), we first addressed the interplay between the RLA and ERISA and concluded that the latter (and later-enacted) statute—notwithstanding its broad preemption of state law remedies—has no preemptive effect on other *federal* enactments—including the RLA.  As we noted in *Northwest*, the Congress "made its will very clear" on this point when it declared in section 514(d) of ERISA:

> "Nothing in this title [] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law."

627 F.2d at 275 (quoting 29 U.S.C. § 1144(d) (alterations in original)). Given the "strong, comprehensive, express statement that ERISA is not to be read as displacing by implication any pre-existing federal legislation," the *Northwest* court concluded that ERISA has no effect on RLA section 204's "mandate[ that] the carrier or the union [] refer disputes *over the application or interpretation of bargaining agreements* covering [rates of pay, rules, or working conditions' terms including employee pensions], if they cannot be resolved informally, to arbitration." *Id*. at 275-76 (quoting 45 U.S.C. § 184 (emphasis added)). In *Northwest*, we emphasized that referral to the board of adjustment for arbitration "is a compulsory statutory obligation." *Id*. at 275. Thus, referral to the Retirement Board is compulsory for Oakey because the dispute is plainly "over the application or interpretation" of the Plan, which controls the outcome whether the 1975 or the 1997 version governs. Accordingly, under *Northwest*, exclusive jurisdiction over the dispute lies with the Retirement Board and the district court correctly dismissed the case for lack of jurisdiction. Nonetheless, Oakey challenges the district court's dismissal on three grounds.

## A. Continuing Vitality of Northwest

First, Oakey asserts that *Northwest* is no longer good law and that we should overrule it through an "*Irons* footnote." It is true that, in a case "in which action by the court *en banc* may be called for, but the circumstances of the case or the importance of the legal questions presented do not warrant the heavy administrative burdens of full *en banc* hearing," a panel of the court may use an "Irons footnote" to "overrul[e] a . . . precedent which, due to an intervening Supreme Court decision, or the combined weight of authority from other circuits, a panel is convinced is clearly an incorrect statement of current law." Policy Statement on En Banc Endorsement

of Panel Decisions (*Irons* Footnote Policy) at 1 (Jan. 17, 1996).[1]  But we are not the least convinced intervening caselaw has vitiated *Northwest*'s rationale.

Oakey contends that *Northwest* is inconsistent with the United States Supreme Court's holding in *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557 (1987), which he characterizes as "highly suggestive that the RLA does not preclude ERISA claims."  Appellant's Br. 35.  We disagree.  In *Buell*, the Court concluded that the RLA did not preclude the plaintiff's negligence claim against his employer under the Federal Employers' Liability Act, which "provides railroad workers with substantive protection against negligent conduct that is *independent of the employer's obligations under its collective-bargaining agreement* [and] also affords injured workers a remedy suited to their needs."  480 U.S. at 565 (emphasis added).  In so holding, however, the *Buell* Court confirmed its decision in *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 325 (1972), that for a "claim based squarely on an alleged breach of the collective-bargaining agreement," the Congress "intended the RLA dispute resolution mechanism to be mandatory" and "courts were therefore foreclosed from addressing claims that properly arise under the RLA."  *Buell*, 480 U.S. at 566.  In *Northwest*, we recognized the same distinction between a claim involving "the application and interpretation of the pension plan," for which arbitration was compulsory under the RLA, and those claims stating "violations of ERISA which are independent of the coverage and meaning of the pension plan," noting that the latter may be litigated in court. *Northwest*, 627 F.2d at

---

[1] In an *Irons* footnote, named after the holding in *Irons v. Diamond*, 670 F.2d 265, 267-68 & n.11 (D.C. Cir. 1981), the panel "seek[s] for its proposed decision the endorsement of the *en banc* court, and announce[s] that endorsement in a footnote to the panel's opinion." *Irons* Footnote Policy at 1.

274. Oakey's claim for unpaid disability benefits is of the former type because it involves the application and interpretation of the 1975 Disability Plan and/or the 1997 Amendment.

Oakey also argues *Northwest* is "contrary to" Supreme Court decisions that narrowly construe ERISA's exception to its state law preemption provision for "any law of any State which regulates insurance," 29 U.S.C. § 1144(b)(2)(A). *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987); *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002); *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004). We see no conflict between *Northwest* and the cited decisions. Preemption of state law is the *rule* for ERISA enforcement and is expansively and inclusively worded, directing that ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described." *See* 29 U.S.C. § 1144(a). It is subject to only a few express statutory exceptions, including the narrowly circumscribed exception for state laws regulating insurance. *See* 29 U.S.C. § 1144(b). It is therefore no surprise that the Supreme Court accords the preemption provision an "expansive sweep." *Dedeaux*, 481 U.S. at 47; *see also Davila*, 542 U.S. at 208-09 (2004) (citing ERISA's "expansive pre-emption provisions"); *Rush Prudential HMO*, 536 U.S. at 376 (noting ERISA's "extraordinarily preemptive power"). The language of ERISA section 514(d) is no less expansive or unequivocal in clarifying that "*[n]othing*" in ERISA can "alter, amend, modify, invalidate, impair, or supersede *any law of the United States*"—including the RLA. 29 U.S.C. § 1144(d) (emphases added). Section 514(d) therefore warrants a comparably broad application.

Finally, we note that notwithstanding Oakey's claim *Northwest*'s force has faded in the years since it issued, every circuit that has considered the issue has reached the same

conclusion as *Northwest*: that the district court lacks ERISA jurisdiction over a dispute involving the interpretation of a collectively-bargained benefit plan within the exclusive jurisdiction of the appropriate adjustment board pursuant to the RLA. *See, e.g.*, *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 782-87 (5th Cir. 2012); *Stephens v. Ret. Income Plan for Pilots of U.S. Air, Inc.*, 464 F.3d 606, 613-14 (6th Cir. 2006);[2] *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583-84 (7th Cir. 1999); *Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 695 (9th Cir. 1993); *Bowe v. Northwest Airlines, Inc.*, 974 F.2d 101, 103 (8th Cir. 1992); *de la Rosa Sanchez v. Eastern Airlines, Inc.*, 574 F.2d 29, 31-33 (1st Cir. 1978).

### B. Arbitration Standard

Second, Oakey asserts that, even if *Northwest*'s preclusion rule survives, it does not apply here. He contends that for the rule to apply (1) the claim "must involve *interpretation* or *construction* of the [collective bargaining agreement]'s terms," Appellant's Br. 22 (citing *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1521 (D.C. Cir. 1989) (emphasis in brief)) and (2) "the interpretative issue must be *dispositive* or *conclusive*" of the claim, *id.* at 23 (citing *Brown v. Ill. Cent. R.R. Co.,* 254 F.3d 654, 668 (7th Cir. 2001) (emphasis in brief)). As we held in *Northwest*, "non-frivolous statutory claim[s] under ERISA" are not subject to RLA preclusion if they are "independent of the correct construction of the pension plan." 627 F.2d at 277; *see also Brown*, 254 F.3d at 658 ("[T]he claim will be preempted if it cannot be adjudicated without interpreting the CBA, or if it can be conclusively resolved by interpreting the

---

[2]The Sixth Circuit has since held that the adjustment board referral requirement is not jurisdictional. *See Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 788 (6th Cir. 2012), discussed *infra* pp.17-19.

CBA." (internal quotation marks omitted)); *Everett v. USAir Group*, 927 F. Supp. 478, 482 (D.D.C. 1996) ("RLA's mandatory arbitration procedures apply . . . to issues arising out of the interpretation of the collective bargaining agreement and not to independent statutory claims under ERISA."), *aff'd*, 194 F.3d 137 (D.C. Cir. 1999) (mem.). Section 204 refers to arbitration of only those "disputes . . . growing . . . out of the interpretation or application of agreements." 45 U.S.C. § 184. But Oakey's claim is plainly such a dispute. He acknowledges that if the 1997 Amendment was effective, his benefits were properly terminated pursuant to its unambiguous terms. *See* Appellant's Br. 11 ("The Plan would win if the 1997 Restatement controls because Oakey does not contest that it contains a provision requiring the termination of disability benefits upon a furlough."). If, as Oakey asserts, the 1997 Amendment was ineffective— because it was not signed by an ALPA representative, *see* 1997 Amendment at 19—Oakey might be entitled to benefits under the 1975 Disability Plan if his furlough did not render him "classified as being other than in active service" so as to end his benefits coverage thereunder—again, an issue of contract interpretation and one that is dispositive. Whichever version of the Plan agreement controls, its interpretation or application governs the outcome.[3]

---

[3]Oakey claims the Plan is foreclosed from arguing that arbitration was required based on the need to interpret the 1975 Disability Plan because "the Plan's defense must stand or fall" on whether the 1997 Amendment—which, he claims, the Plan sent Oakey's counsel "as the reason for its determination"—"is legitimate." Appellant's Br. 25 (asserting Plan "sent Oakey as the reason for its determination the one page of the purported 1997 Restatement that includes the section allowing for termination of benefits upon furlough"). "This is so," he maintains, "because it is a cardinal rule of ERISA jurisprudence that a plan's decision to deny benefits can be upheld, if at all, solely upon '[the] rationales that were specifically articulated in the administrative

## *C. Forfeiture of Preclusion Argument*

Finally, Oakey argues the Plan forfeited reliance on *Northwest*'s preclusion rule. Recognizing that if the rule is "jurisdictional"—that is, if section 514(d) vests exclusive jurisdiction over this dispute in the Retirement Board—his forfeiture argument fails, he asserts that the arbitration requirement is "a non-jurisdictional, claims-processing rule . . . subject to forfeiture."[4] Appellant's Br. 50 (citing *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 524 (D.C. Cir. 2010)); *see Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (" '[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.' " (quoting *United States v. Cotton*,

---

record as the basis.' " *Id.* at 24-25 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007)). Oakey's argument overlooks that there *is* no administrative record because Oakey failed to pursue mandatory arbitration to create one. Had he done so and challenged the validity of the 1997 Amendment, the Plan would have provided a response and we would have an administrative record to review. But we do not.

[4]The Plan asserts Oakey waived his non-jurisdictional argument by failing to raise it below. Appellee's Br. 35. We believe it appropriate, however, to address the argument as it bears on subject matter jurisdiction. *See Beckett v. Air Line Pilots Ass'n*, 59 F.3d 1276, 1278 n.2 (D.C. Cir. 1995) (" '[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it.' " (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quotation marks omitted; alteration in original)); *see also Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992) ("Courts of appeals are not rigidly limited to issues raised in the tribunal of first instance; they have a fair measure of discretion to determine what questions to consider and resolve for the first time on appeal.").

535 U.S. 625, 630 (2002))). In *Northwest*, we treated RLA section 204 as vesting exclusive jurisdiction of covered disputes in the applicable adjustment board. *See Northwest*, 627 F.32d at 275 ("The arbitral board's jurisdiction is exclusive and cannot be avoided by efforts to bring the dispute directly into court."). Revisiting the issue now, we reach the same conclusion.

In recent decisions, the Supreme Court has warned against the "profligate" use of "jurisdictional" to describe what are in fact non-jurisdictional requirements, specifically claim-processing rules. In *Arbaugh v. Y&H Corp.*, the Court advised:

> "Jurisdiction," this Court has observed, "is a word of many, too many, meanings." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 90 (1998) (internal quotation marks omitted). This Court, no less than other courts, has sometimes been profligate in its use of the term. For example, this Court and others have occasionally described a nonextendable time limit as "mandatory and jurisdictional." *See, e.g., United States v. Robinson*, 361 U.S. 220, 229 (1960). But in recent decisions, we have clarified that time prescriptions, however emphatic, "are not properly typed 'jurisdictional.' " *Scarborough v. Principi*, 541 U.S. 401, 414 (2004). . . . On the subject-matter jurisdiction/ ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous. . . . Judicial opinions, the Second Circuit incisively observed, "often obscure the issue by stating that the court is dismissing 'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure

14

to state a claim." *Da Silva* [*v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2d Cir. 2000)]. We have described such unrefined dispositions as "drive-by jurisdictional rulings" that should be accorded "no precedential effect" on the question whether the federal court had authority to adjudicate the claim in suit. *Steel Co.*, 523 U.S., at 91.

546 U.S. at 515-16; *see also Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 71 (2009); *Eberhart v. United States*, 546 U.S. 12, 16-19 (2005) (per curiam); *Kontrick v. Ryan,* 540 U.S. 443, 454-55 (2004); *Carlisle v. United States,* 517 U.S. 416, 434-35 (1996) (Ginsburg, J., concurring). In order to address the mislabeling point, *Arbaugh* drew a "readily administrable bright line" to segregate jurisdictional prerequisites from non-jurisdictional mandatory claim-processing rules:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Arbaugh*, 546 U.S. at 515–16 (citation and footnote omitted). Applying this test, the *Arbaugh* court concluded that the 15-employee threshold for coverage under Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e(b), is not jurisdictional, noting that "the 15-employee threshold appears in a separate provision [from Title VII's jurisdictional provision] that 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.' " *Id*. at

515 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). We find this to be a quite different case.

The jurisdictional inquiry requires an "examination of the 'condition's text, context, and relevant historical treatment," *Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1328 (D.C. Cir. 2012) (quoting *Reed Elsevier*, 559 U.S. at 166). We begin, as with all statutory construction, with the text itself. Section 204 of the RLA provides in full:

> The disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on April 10, 1936 before the National Labor Relations Board, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board, as hereinafter provided, with a full statement of the facts and supporting data bearing upon the disputes.

> It shall be the duty of every carrier and of its employees, acting through their representatives, selected in accordance with the provisions of this subchapter, to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title.

> Such boards of adjustment may be established by agreement between employees and carriers either

on any individual carrier, or system, or group of carriers by air and any class or classes of its or their employees; or pending the establishment of a permanent National Board of Adjustment as hereinafter provided. Nothing in this chapter shall prevent said carriers by air, or any class or classes of their employees, both acting through their representatives selected in accordance with provisions of this subchapter, from mutually agreeing to the establishment of a National Board of Adjustment of temporary duration and of similarly limited jurisdiction.

45 U.S.C. § 184.  The statutory language "clearly states" that the arbitration requirement is jurisdictional, expressly " 'speak[ing] in jurisdictional terms.' "  *Arbaugh*, 546 U.S. at 515 (quoting *Zipes*, 455 U.S. at 394).  It directs that "every carrier and . . . its employees" establish a board of adjustment "of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by . . . boards of adjustment, under [RLA § 3, 45 U.S.C. § 153]"—which cited provision establishes a " 'National Railroad Adjustment Board [(NRAB)] . . . [t]o have jurisdiction over disputes involving" various rail carrier employees.  45 U.S.C. § 153 First.  In fact, the Supreme Court recently confirmed, in a non-drive-by-ruling, that section 204 is jurisdictional.   In *Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers & Trainmen General Committee of Adjustment*, the Court concluded that, while the Congress "authorized the Board to prescribe rules for the presentation and processing of claims," such rules as the NRAB might adopt are not jurisdictional because "Congress alone controls the [NRAB's] jurisdiction."  558 U.S. at 71.  The Court explained that in RLA section 3 the Congress "vested in the [NRAB] jurisdiction to adjudicate grievances of railroad employees that remain unsettled after pursuit of internal procedures."  *Id*.; *see also id*. at 82 ("The [NRAB's]

jurisdiction extends to all disputes between carriers and their employees growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . . " (ellipsis in original; quotation marks omitted)).  Given that section 204 expressly grants the adjustment boards jurisdiction co-extensive with the NRAB's, we can but conclude that the provision is jurisdictional regarding its adjustment board arbitration requirement.  *Cf. Chevron Mining*, 684 F.3d at 1329 (finding National Labor Relation Act section 10(e)'s exhaustion requirement jurisdictional because its "text is virtually identical to section 313 of the Federal Power Act, which we have held is a model of the 'clear and unequivocal statement' required to make exhaustion a jurisdictional prerequisite" (quoting *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 962–63 (D.C. Cir. 1999)).  Moreover, the Supreme Court's "historical treatment" of RLA § 3 as conferring "*exclusive*" jurisdiction over collective bargaining agreement disputes further supports our conclusion that jurisdiction lies with the adjustment board. *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 304 (1989); *Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 38 (1963); *Penn. R.R. v. Day*, 360 U.S. 548, 552 (1959); *Slocum v. Del., Lackawanna & W. R.R. Co.*, 339 U.S. 239, 244 (1950).

In urging that section 204's arbitration requirement is *not* jurisdictional, Oakey relies heavily on the Sixth Circuit's opinion in *Emswiler v. CSX Transportation, Inc.*, 691 F.3d 782, 788 (6th Cir. 2012), the only circuit decision to hold that section 204's arbitration requirement is not jurisdictional.  We respectfully decline to join our sister circuit in its singular perspective.

In *Emswiler*, the Sixth Circuit based its holding on three premises.  First, it observed that collective bargaining agreement disputes "raise a question 'arising under' federal

law" and therefore should be subject to the district court's federal question jurisdiction under 28 U.S.C. § 1331." *Id*. at 789. But the "federal law" in question here is RLA section 204, which expressly and unequivocally consigns interpretation/application disputes to arbitration before the appropriate adjustment board—with no mention of federal court jurisdiction. Second, the Sixth Circuit asserts that the failure to arbitrate affects the plaintiff's "ability to prove the defendant bound by the federal law asserted as the predicate for relief—a merits-related determination." *Id*. (quoting *Arbaugh*, 546 U.S. at 511 (quotation marks omitted)). The selection of the proper statutory forum, however—unlike the 15-employee threshold *Arbaugh* described—is not a "merits-related determination." Finally, the Sixth Circuit reasoned that "[t]he fact that courts have recognized exceptions to the RLA arbitral requirement supports the conclusion that the requirement is a nonjurisdictional restriction." *Id*. at 790. In particular, the court relied on an exception if "pursuing arbitral mechanisms would be futile due to collusion between the union and employer." *Id*. (citing *Glover v. St. Louis-S.F. Ry. Co.*, 393 U.S. 324, 331 (1969)). In *Glover*, however, the Supreme Court explained that the RLA's arbitration requirement did not confer jurisdiction over the dispute there because "the suit was one brought by the employees against their own union, claiming breach of the duty of fair representation," while RLA § 3 First (i) (like section 204) "applies only to 'disputes between an employee or group of employees and a carrier or carriers.' " 393 U.S. at 328 (quoting *Conley v. Gibson*, 355 U.S. 41, 44 (1957) (quoting 45 U.S.C. § 153 First (i))). Moreover, the Court in *Glover* expressly affirmed that it had previously "held that the Railroad Adjustment Board has *exclusive jurisdiction*, under [RLA § 3 First (i)] . . . to interpret the meaning of the terms of a collective bargaining agreement." *Id*. (footnote omitted; emphasis added). As we have already noted, the statutory

language—to which *Arbaugh* unequivocally directs us for our answer—"clearly states" the adjustment board has jurisdiction. The Sixth Circuit strayed in directing its focus elsewhere.

For the foregoing reasons, we affirm the district court's judgment of dismissal for lack of subject matter jurisdiction.

*So ordered*.