# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 21, 2014            Decided June 10, 2014

No. 13-5096

SAMI ABDULAZIZ ALLAITHI,
APPELLANT

v.

DONALD H. RUMSFELD, FORMER SECRETARY OF DEFENSE,
DEPARTMENT OF DEFENSE, ET AL.,
APPELLEES

Consolidated with 13-5097

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-cv-01677)
(No. 1:06-cv-01996)

*Russell P. Cohen* argued the cause for appellants. With him on the briefs were *Howard M. Ullman* and *Shayana D. Kadidal*.

*Sydney Foster*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, and *Matthew M. Collette*, Attorney. *Sharon Swingle*, Attorney, entered an appearance.

Before: TATEL and BROWN, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* BROWN.

BROWN, *Circuit Judge.* As the United States enters the coda of its military engagement in Afghanistan, we continue with our task of resolving the many legal questions left in the wake of warfare. In this case, we assess whether certain detainees cleared by a military tribunal but nevertheless subjected to continued detention and allegedly abusive treatment have sufficiently alleged that those authorizing and supervising their detention acted outside the scope of their employment. We conclude they did not, and we affirm the decision of the district court.

I

This appeal arises from events surrounding six individuals formerly detained at the U.S. Naval Base in Guantanamo Bay, Cuba. Yuksel Celikgogus, Ibrahim Sen, Nuri Mert, Zakirjan Hasam, Abu Muhammad, and Sami Allaithi were all kept at the detention facility for various periods of time between 2001 and 2006. Celikgogus, Sen, and Mert were returned to their home country of Turkey without any determination by the Combatant Status Review Tribunals (CSRTs). Hasam, Muhammad, and Allaithi appeared before a CSRT and were subsequently cleared—i.e., no longer classified as suspected enemy combatants.

The CSRT determinations, however, did not mark the end of their respective stays at Guantanamo. Hasam, for instance, was informed he was cleared on May 8, 2005 but was not transferred to the custody of Albanian officials until

November 16, 2006. Muhammad similarly received word in May 2005, but did not depart for Albania until nearly two years later. Allaithi was informed of his CSRT clearance sometime after November 2004, and he was transferred to the custody of Egyptian officials about ten months after his appearance before a CSRT.

Their extended stays could hardly be called uneventful. According to Hasam, he was subjected to forced grooming, solitary confinement, sleep deprivation, forced medication, transport in "shackles and chains, blackened goggles, and ear coverings," and the disruption of his religious practices after CSRT clearance. *See* J.A. at 68–69. After receiving his CSRT determination, Muhammad was "shackled, physically searched and insulted." *See* J.A. at 74.

On November 21, 2006, Celikgogus, Sen, Mert, Hasam, and Muhammad filed suit in district court, claiming these events—in addition to ones that took place prior to CSRT clearance but not before us today—gave rise to various causes of action, including violations of the Alien Tort Statute (ATS), the Geneva Convention, the Vienna Convention on Consular Relations, the First Amendment, the Due Process Clause, the Religious Freedom Restoration Act (RFRA), and the Federal Civil Rights Act. Nearly two years later, Allaithi followed suit, making similar claims. The crux of the plaintiffs' allegations was that the named defendants "authorized" and "turned a blind eye to" the alleged abuses.[1] *See* J.A. at 80, 116–17.

---

[1] The complaints also contain allegations against Doe defendants. The plaintiffs did not appeal the district court's dismissal of that aspect of their respective cases. Any issues concerning these defendants are therefore forfeited.

The Attorney General certified the Appellees were acting within the scope of their employment at the time of the alleged events. The Government then filed a motion to dismiss in both cases, arguing both iterations of *Rasul v. Myers* foreclosed the Appellants' claims. *See generally Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009) (*Rasul II*); *Rasul v. Myers*, 512 F.3d 644 (D.C. Cir.) (*Rasul I*), *vacated and remanded by* 555 U.S. 1083 (2008). After consolidating the two suits, the district court agreed with the Government's position and dismissed the cases. With respect to the Appellants' treatment after CSRT clearance, the district court explained the determination was a "distinction without a difference," as the tribunals "did not change the fact that the plaintiffs were detainees of the U.S. military as part of its operations in conducting the war on terror." *Celikgogus v. Rumsfeld*, 920 F. Supp. 2d 53, 58–59 (D.D.C. 2013). Because the ATS claims against the individual defendants should have been Federal Torts Claims Act (FTCA) claims against the United States, the district court concluded the plaintiffs' failure to exhaust available administrative remedies deprived it of subject matter jurisdiction. *See id.* at 59.

II

We review a district court's Rule 12(b)(1) dismissal *de novo*. *Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227, 231 (D.C. Cir. 2013).

The Alien Tort Statute (ATS) grants jurisdiction and recognizes a cause of action for "private claims [for international law violations] under federal common law." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663 (2013). In ATS suits filed against officers or employees acting within the scope of their employment, the United States is substituted as a defendant pursuant to the Westfall Act, 28

U.S.C. § 2679(d)(1). The Attorney General may certify an employee was acting within the scope of his employment, though his certification only serves as prima facie evidence that can be rebutted by "specific facts that, taken as true, would establish that the defendant's actions exceeded the scope of his employment." *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013).

The question of whether a particular act falls within the scope of employment is governed "by the law of the place where the employment relationship exists." *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006). In *Rasul I*, we explained that, for cases involving acts related to detention at Guantanamo Bay, the place of employment is the District of Columbia. *Rasul I*, 512 F.3d at 655. D.C. law, in turn, has incorporated the Second Restatement of Agency, *see, e.g.*, *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 427–28 (D.C. 2006), which sets forth four factors, all of which must apply for the conduct of a servant to fall within the scope of employment:

(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master; and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958); *see also Jacobs*, 724 F.3d at 221; *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006). We apply the test "very expansively," and in essence ask "whether the defendant merely was on duty or on the job

when committing the alleged tort." *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008); *see also Ballenger*, 444 F.3d at 664 (noting the duties test is to be "liberally construed").

Though we are presented with an extensive chronology of events with multiple players, the actions at issue can be divided into two. First, we have the continued detention of the plaintiffs post-CSRT clearance. Second, we have all acts attendant to that continued detention—the allegations of torture, religious desecration, etc., that occurred during the post-clearance period. We conclude that claims in both categories, as pled, fail to support the conclusion that the defendants acted outside the scope of their employment.

## A

From the outset, we affirm the decision of the district court as to Celikgogus, Sen, and Mert. These three individuals were not cleared by a CSRT—a fact they claim is a dispositive factor. And by their own admission, this case does not focus on them. *See* Reply Br. at 7 n.4 ("As a result of this Court's rulings in the *Rasul* cases, this appeal focuses on the post-[CSRT] determination, detention, and abuse of Plaintiffs Al Laithi, Hasam, and Muhammad."). Celikgogus, Sen, and Mert cannot prevail with *Rasul I* in the books, and

we are in no position to overturn that decision of this court.[2] *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) ("One three-judge panel . . . does not have the authority to overrule another three-judge panel of the court." (citation omitted)).

That leaves us with Hasam, Muhammad, and Allaithi, who have all raised claims of prolonged detention. Hasam was detained for a little over a year and a half after his clearance by a CSRT; Muhammad for about two. There is some uncertainty about the duration between Allaithi's receipt of CSRT clearance and his transfer to Egyptian officials, but about ten months elapsed between his appearance before the tribunal and his eventual transfer.

Allaithi and his fellow former detainees argue the CSRT clearance ended the duties of their jailers. According to them, the 2001 Authorization for the Use of Military Force only permitted the lawful detention of suspected enemy combatants. Therefore, they reason military officials could not continue to detain cleared detainees, as such continued

---

[2] Unlike their three co-plaintiffs, Celikgogus, Sen, and Mert do not allege post-CSRT abuses, namely because it would be chronologically impossible for them to allege abuse that occurred after a CSRT clearance that never happened. We see no reason to disagree with their concession that the pre-release abuse they allegedly endured is not discernibly different from the sort in *Rasul I. See* Reply Br. at 7 n.4. Certainly, Celikgogus, Sen, and Mert could have made allegations that better satisfied the Restatement factors, as compared to the *Rasul I* plaintiffs. The trio did not, and thus we cannot entertain that hypothetical. *See Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) ("Federal courts may not . . . give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990))).

detention would be *ultra vires* and thus outside the scope of employment.  *See* Appellants' Br. at 28.

Obviously, however, the individual defendants here were expected to facilitate continued detention post-CSRT clearance.  In a July 7, 2004 memorandum establishing the CSRTs, the Pentagon indicated the transfer of cleared detainees would require coordination between three parties: the Secretary of Defense, the Secretary of State, and a detainee's country of citizenship (or a suitable substitute).  *See* Memorandum from Paul Wolfowitz, Deputy Sec'y of Def., at 3–4 (July 7, 2004) (explaining that, once "the Tribunal determines that the detainee shall no longer be classified as an enemy combatant, . . . [the Secretary of Defense] or his designee shall so advise the Secretary of State, in order to permit the Secretary of State to coordinate the transfer of the detainee for release to the detainee's country of citizenship or other disposition consistent with domestic and international obligations and the foreign policy of the United States").  The Secretary of the Navy subsequently instructed officials at Guantanamo Bay to coordinate the continued detention and transportation of cleared detainees.  *See* Memorandum from Gordon England, Sec'y of the Navy, Implementation of the Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, encl. 1, at 9 (July 29, 2004) ("In these cases [where a detainee is no longer classified as an enemy combatant] the Director, CSRT, will ensure coordination with the Joint Staff with respect to detainee transportation issues.").  Though the memoranda are hardly paragons of clarity, they do establish that post-clearance detention was authorized and expected.  Nothing indicates a failure to effectuate an immediate release of detention was a dereliction of duty putting the Appellees' conduct outside the scope of employment.  To think otherwise

would be to ignore the realities of war, and, for that matter, administrative bureaucracy.

B

These memoranda, however, make no mention of acts attendant to post-clearance detention. They contain no reference endorsing the disruption of religious practices, the shackling and chaining of detainees, and the imposition of solitary confinement. Still, based on our understanding of the pleadings, we conclude these actions fell within the defendants' scope of employment.

We first assess whether the alleged misconduct is "of the kind" the named defendants were employed to perform. "To qualify as conduct of the kind [an employee] was to perform, [his or her] actions must have either been 'of the same general nature as that authorized' or '*incidental* to the conduct authorized.'" *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995) (quoting RESTATEMENT (SECOND) OF AGENCY § 229 (1957)). Conduct is "incidental" so long as it is "foreseeable"—that is, it must be a "direct outgrowth of the employee's instructions or job assignment." *Id.* (quoting *Boykin v. Dist. of Columbia*, 484 A.2d 560, 562 (D.C. 1984)). The foreseeability test is to be liberally applied—"broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf."

*Ballenger*, 444 F.3d at 664. The test is not a particularly rigorous one.[3]

Hasam alleges he was subjected to disruption of his religious practices, solitary confinement, shackles and chains, blackened goggles, ear coverings, sleep deprivation, body searches, and forcible shaving. *See* J.A. at 68–69. Similarly, Muhammad contends he was "shackled, physically searched and insulted after his non-enemy combatant designation," with "guards . . . disrupt[ing] his religious practice . . . and desecrat[ing] . . . Korans." *See* J.A. at 74–75. They assert this unpalatable treatment could not be within the scope of their jailers' employment—the two ostensibly had no intelligence value post-CSRT clearance, unlike the detainees who brought similar challenges in *Rasul I*.[4]

But *Rasul I* still controls. In that case, we made it clear the sort of conduct described here was incidental to "the *detention* and interrogation of suspected enemy combatants" and therefore "the type of conduct the defendants were

---

[3] This court has previously upheld a jury's determination that sexual assault committed by an employee of a delivery service in the course of delivering a mattress was "foreseeable" and therefore incidental to authorized duties. *See Lyon v. Carey*, 533 F.2d 649, 651 (D.C. Cir. 1976). Similarly, in *Johnson v. Weinberg*, 434 A.2d 404 (D.C. 1981), the District of Columbia Court of Appeals— taking a cue from *Lyon*—determined the shooting of a customer by a laundromat employee could potentially be an "outgrowth of a job-related controversy." *Id.* at 409.

[4] We note Allaithi does not allege he was subjected to treatment similar to that endured by Hasam and Muhammad after his CSRT clearance. Instead, he only avers he was "held for ten additional months after his CSRT before his transfer out of Guantanamo." J.A. at 114.

employed to engage in." *See Rasul I*, 512 F.3d at 658–59. Though the intelligence rationale has dissipated, the need to maintain an orderly detention environment remained after CSRT clearance.

*Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. 1979), provides us with a helpful contrast. There, a railroad brakeman was traveling from New Jersey to Alexandria, Virginia, for work. *See id.* at 28. After taking the train down to D.C., he took a cab to complete his journey. *See id.* En route, the railroad employee assaulted his cab driver. *See id.* at 29. The D.C. Court of Appeals determined the railroad company that employed the brakeman could not be held liable for this assault, as it was "neither a direct outgrowth of the employee's instructions or job assignment, nor an integral part of the employer's business activity, interests or objectives." *Id.* at 32. As "nothing in the business of running a railroad . . . [made] it likely that an assault [would] occur between a railroad brakeman and a taxicab driver . . . [over a] taxicab ride," the court determined the tort was beyond the scope of employment. *Id.*

The conduct here, however, is not similarly devoid of a connection between tort and employer. Indeed, the treatment of the detainees in this case appears to be standard for all those similarly situated. *See, e.g.*, *Ali v. Rumsfeld*, 649 F.3d 762, 765–66 (D.C. Cir. 2011); *Rasul I*, 512 F.3d at 650–51. Authorized or not, the conduct was certainly foreseeable because maintaining peace, security, and safety at a place like Guantanamo Bay is a stern and difficult business. We are therefore hard-pressed to conclude the actions leading to the plaintiffs' treatment were not "a direct outgrowth of the [defendants'] instructions or job assignment." *See Penn Central*, 398 A.2d at 32. Instead, we hold the conduct was incidental to the kind authorized by the CSRT memoranda.

We also cannot agree with the Appellants' contention that the Appellees had no purpose to serve the master—the third Restatement requirement. The master here is the United States, and it has a well-recognized penological interest in "maintaining security and discipline" at Guantanamo Bay. *See Aamer v. Obama*, 742 F.3d 1023, 1040 (D.C. Cir. 2014). Our review of the pleadings suggests the defendants served the purpose of fulfilling that interest and took actions accordant with effecting "detention in a military prison." *See* Oral Arg. Tr. at 20:10 (explaining one of the underlying functions of the defendants was "maintaining security and order at the detention facility"). The fact that a detainee has been cleared by a CSRT, i.e., may not have been involved in combat against American forces, does not extinguish the possibility the detainee may nevertheless decide to be disruptive until his release.

The Appellants' argument does not precisely reflect what the Restatement requires. While they argue "[t]he moment the employee begins pursuing his own ends, the employee is no longer within the scope of his employment even though he may appear to be on the job," Appellants' Br. at 31, this is not an accurate articulation of D.C. law. Local law requires an employee be *solely* motivated by his own purposes for consequent conduct to fall outside the scope of employment. *See Weinberg v. Johnson*, 518 A.2d 985, 990 (D.C. 1986) ("The first criterion . . . excludes from the scope of employment all actions committed *solely* for the servant's own purposes." (emphasis added)). It is difficult for a detainee to plausibly allege the defendants' post-clearance conduct was *entirely* motivated by some sort of personal animus; this is especially true when the conduct is similar, if not identical, to the sort determined to be within the scope of employment *prior* to clearance, *see, e.g.*, *Rasul I*, 512 F.3d at

658–59. Indeed—and critically for this case—the Appellants failed to assert that the Appellees' actions were completely devoid of a purpose to serve the United States, despite having ample notice of the scope-of-employment framework set forth by *Rasul I*. Moreover, the allegations set forth in the complaint—that the named defendants "authorized, mandated, implemented, encouraged, condoned, acquiesced in, turned a blind eye to, or failed in their command obligations to prevent the torture and cruel, inhuman, or degrading treatment that took place at Guantanamo," *see* J.A. at 78, 80, 116–19—are the conclusory sort that "are not entitled to the presumption of truth." *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Despite vividly detailing the various abuses allegedly endured by the Appellants, the complaints do not specify how the *named defendants* were involved with these abuses. *See* J.A. at 68–69, 75, 112–13. With the first and third Restatement factors satisfied—and the others uncontested—we conclude the allegedly abusive conduct fell within the named defendants' scope of employment.

## III

We briefly address the remainder of the Appellants' arguments. First, they contend the district court erred in dismissing their RFRA and *Bivens* claims. These contentions are foreclosed by the *Rasul* decisions, and *stare decisis* forbids us from revisiting the wisdom of existing caselaw. The Appellants cannot pursue a *Bivens* claim because qualified immunity "insulates the defendants" here; alternatively, special factors counsel against allowing the claim to move forward. *See Rasul II*, 563 F.3d at 530, 532 n.5. Their RFRA claim meets a similar fate; because the Appellants were "located outside sovereign United States territory at the time their alleged RFRA claim arose, they do

not fall [within the Act's] definition of 'person'" and are therefore barred from bringing a RFRA challenge. *See Rasul I*, 512 F.3d at 672.

As for their Vienna Convention argument, we decline to entertain the Appellants' bare-bones contention that the treaty confers a private right of action. "In this circuit, it is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Davis v. Pension Benefit Guar. Corp.*, 734 F.3d 1161, 1166–67 (D.C. Cir. 2013). Two sentences of argument, a threadbare conclusion, and a handful of marginally relevant citations do not provide us with enough to adequately assess the strength of their legal conclusions. *See* Appellants' Br. at 40–41. But even if they did, we strongly doubt the Appellants' position is the correct one. *See, e.g.*, *United States v. Emuegbunam*, 268 F.3d 377, 392–94 (6th Cir. 2001); *United States v. Jimenez-Nava*, 243 F.3d 192, 197–98 (5th Cir. 2001).

This case has had a long history, one clouded by uncertainty as *Rasul* was making its way up and down the courts. But the now-settled law reveals several flaws and inadequacies of the Appellants' complaint—some discussed above, some not. In response, counsel invites us to remand this case to allow them an opportunity to rectify whatever mistakes lie in their pleadings. *See, e.g.*, Oral Arg. Tr. at 11:13–16, 13:14–18. We cannot. Not only did the Appellants have ample time to amend their complaint after the dust settled in *Rasul*, we ordinarily cannot return a case to the district court for the opportunity to amend inadequate pleadings unless the plaintiffs first ask that court for leave to amend and are denied. *See Brooks v. Grundmann*, --- F.3d ---, 2014 WL 1420295, at *6 (D.C. Cir. Apr. 15, 2014)

(explaining a failure to ask the district court for leave to amend a complaint "bars [the court] from remanding [the] case to give [the plaintiff] an opportunity to fix her complaint"). Though the *Celikgogus* plaintiffs did ask for leave to amend, the district court granted their motion for leave, which gave rise to their second amended complaint. Despite being filed *after* the release of *Rasul I*, the second complaint still did not conform to the framework we set forth in that case. And the Appellants never asked for leave to amend again. Thus, we have little reason to veer from our precedent; accordingly, we decline to send this case back to the district court.

## IV

The district court's grant of Appellees' motion to dismiss is

*Affirmed.*